## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

_____

In re:

David Zak, Debtor

Chapter 7
Case No. 15- 10098-JNF

_____

## MOTION FOR EXTENSION OF TIME TO
## OBJECT TO DISCHARGE

Creditor Greater Boston Legal Services on its own behalf and on the behalf of its clients and other similarly situated creditors, respectfully requests that this Court extend the deadline for objecting to the discharge of Debtor David Zak (the "Debtor") of certain debts from the current deadline to 60 days after the conclusion of the meeting of creditors.

In support of this Motion, movant states as follows.

1) This case was filed by the Debtor on January 12, 2015.

2) A meeting of the creditors was held on February 12, 2015 and Mr. Zak was questioned extensively by the U.S. Trustee, Assistant Attorney General Sara Cable on behalf of the Massachusetts Attorney General's office and Todd S. Kaplan on behalf of Greater Boston legal Services and its' clients.

3) The meeting was continued to March 26, 2015.

4) On March 26, 2005, the meeting was held and Mr. Zak stated on the record that he would provide copies of documents that he previously had provided to the U.S. Trustee to the Attorney General's office and Greater Boston Legal Services within approximately two weeks.

5) Mr. Zak has not delivered these documents to Greater Boston Legal Services.

6) The meeting of the creditors has been extended until May 7, 2015.

7) Greater Boston Legal Services expects that the documents (if provided) will require extensive follow-up questioning and result in a continuance of the meeting of creditors again.

8) Creditor Greater Boston Legal Services filed a complaint against Debtor Zak with the Massachusetts Commission Against Discrimination and Probable Cause was found that Debtor Zak engaged in discriminating against Latino homeowners by targeting them for services that he did not provide. (See Probable Cause Finding Attached.)

9) That complaint is being considered by a hearing officer of the Massachusetts Commission Against Discrimination after several days of hearings in the summer of 2014.

10) Creditor Greater Boston Legal Services and its clients believe that the findings from the hearing officer together with forthcoming information from Debtor Zak will provide a basis for denying a discharge of debts that were a result of Zak's alleged deliberate discriminatory acts.

**WHEREFORE**, the Creditor respectfully requests as follows:

That this Court enter an Order extending the deadline by which Creditors may file objections to the discharge of the Debtor to deadline to 60 days after the conclusion of the meeting of creditors, and that this Court grant such other relief as this Court deems just and equitable.

Respectfully submitted,


By: /s/ Todd S. Kaplan
Todd S. Kaplan, BBO # 634710
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114
*TKAPLAN@gbls.org*
(617) 603-1647




Dated: April 13, 2015

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) on April 13, 2015.

/s/ Todd S. Kaplan
Todd S. Kaplan

Dated: April 13, 2015

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone:  (617) 994-6000 Fax:  (617) 994-6024**

Date:  5/1/2012

Isaac H. Peres, Esq.
Law Offices
689 Massachusetts Ave.
Cambridge, MA 02139

Nadine H. Cohen, Esq.
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114

Josue and Clara Garcia, et al. v. David Zak, et al.

MCAD Docket Numbers: 11BPR 01091, 01092, 01093, 01094, 01096, 01099, 01100, 01101, 01102, 01105, 01108, 01110, 01112, 01114, 01115, 01116, 01117.

HUD Docket Numbers: 011103108, 011103118, 011103128, 011103138, 011103148, 01103158, 011103168, 011103178, 011103188, 011193198, 011103208, 011103218, 011103228, 011103238, 011103248, 011103898, 011103908.

### PROBABLE CAUSE FINDING

Dear Parties/Counsel:

You are hereby notified that I have found probable cause to credit the allegations in the above-referenced complaint. A copy of the disposition is enclosed.

The Commission is charged by statute (G.L.c.151B, § 5) to try to enforce compliance with the Commonwealth's anti-discrimination laws without resort to a public hearing.  To this end, **parties and counsel** are required to attend a conciliation conference at the Commission's office on Monday, June 18, 2012 at 10:00 A.M.

Conciliation is difficult or impossible unless persons with authority to settle the case are present.  The officer designated to appear for a business or other entity must be familiar with the case and authorized to offer an appropriate settlement.

Complainant's counsel should send a written proposal of settlement to Respondent's counsel not less than 10 days before the scheduled meeting.  We also require that parties hold preliminary settlement discussions at least five days before the conciliation date.

Be prepared to spend one to two hours at the conciliation session.  **Failure to attend the session may result in immediate certification to public hearing and/or imposition of sanctions for costs incurred by the Commission and the opposing party.  Furthermore, Complainant's failure to attend may result in dismissal of the case.**

No continuances will be granted except upon written motion to the Conciliation Clerk with notice to the opposing party and upon a showing of good cause.  Please direct correspondence to Vanessa Davila via fax at (617) 994-6024.

All housing complaints where applicable were filed with the U.S. Department of Housing and Urban Development. Our finding will be forwarded to the Regional Office, 10 Causeway Street, O'Neill Federal Building, Boston.

Josue and Clara Garcia, et al. v. David Zak, et al.

Page 2

Please be advised that pursuant to M.G.L. Chapter 151B, Section 5, you have the right to elect judicial determination of the above-referenced matter.  Your rights are fully explained on the attached page.  You have twenty (20) days from receipt of this letter to provide the Commission with your intent to elect judicial determination.

Very truly yours,

Sunila Thomas-George
Investigating Commissioner

Cc:

David Zak
c/o Zak Law Offices, P.C.
Attn: Director of Human Resources
200 Highland Avenue, Suite 301C
Needham Heights, MA 02494

Josue and Clara Garcia, et al. v. David Zak, et al.

MCAD Docket Numbers: 11BPR 01091, 01092, 01093, 01094, 01096, 01099, 01100, 01101, 01102, 01105, 01108, 01110, 01112, 01114, 01115, 01116, 01117.

I.    JURISDICTION

On May 5, 2011, a consolidated complaint was filed with this Commission alleging, among other things, that certain Latino homeowners were subjected to a pattern and practice of discrimination when they were targeted for substandard loan modification services offered by Respondents David Zak, Zak Law Offices, and the Loan Modification Group Inc. (hereinafter "Respondents"). The complaint, involving seventeen (17) complainants. alleges that Respondents employed a policy in which they targeted Latino homeowners based on the assumption that they are less sophisticated in mortgage matters and thus more susceptible to the alleged unlawful tactics used by Respondents. In addition to the pattern and practice claim, in violation of M.G.L. c. 151B, Section 4 (3B), the complaints also allege that the Respondents have made, printed or published or caused to be made, printed or published notices, statements or advertisements that indicate a preference, limitation or discrimination based on national origin, in violation of M.G.L. c. 151B. § 4 (7B), that the Respondents have interfered with the Complainants' exercise of their fair housing rights, in violation of M.G.L. c. 151B, § 4(4A), and that the Respondents discriminated against the complainants in a place of public accommodation in the terms and conditions of the services rendered based on their national origin, in violation of M.G.L. c. 272, Section 92A .

For administrative purposes only, when the consolidated complaint was received by the Commission, the original filing was docketed as seventeen (17) separate complaints. They were reviewed independently of the other complaints against Respondents.

Following a preliminary review of the facts alleged by each of the 17 Complainants, it was determined that Mr. Gutierrez's, 11BPR01105, and Ms. Morales' 11BPR01108. complaints, were time barred as occurring "more than 300 days before [the] filing of claim." These matters were dismissed for Lack of Jurisdiction. The Lack of Jurisdiction Findings were timely appealed and were vacated by the Investigating Commissioner on September 26, 2011[1]. The cases were remanded for investigation.

Respondent David Zak is the Incorporator, President, Treasurer, Secretary, Director and Registered Agent for Respondent Zak Law Offices P.C. and

---

[1] The Commission's regulations provide that "the 300 day requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature..." 804 CMR 1.10(2).

Respondent Loan Modification Group, Inc. d/b/a Loan Modification Group of Massachusetts. Zak Law Offices are located at 701 Broadway, Revere, MA. At the time Complainants engaged Respondent, David Zak, Zak Law Offices operated two offices, located at 54 Yeamans Street, Revere MA 02151 and 200 Highland Avenue, Suite 301C, Needham, MA 02494. Respondents David Zak, Zak Law Offices P.C and Loan Modification Group engaged in residential real-estate related transactions and the provision of other financial assistance for maintaining a dwelling, namely providing mortgage loan modification services to homeowners. Respondents operate a place of public accommodation, as defined by M.G.L. c. 272, § 92A, which is open to and accepts or solicits the patronage of the general public and provides services to the general public.

II.    COMPLAINANTS' ALLEGATIONS

1.    Josue and Clara Garcia

The Complainants Josue and Clara Garcia ("the Garcias") are Latino individuals residing at 234 Bennington Street #1, East Boston, MA 02128. They are originally from El Salvador, do not speak or read English well.

The Garcias heard about Attorney Zak from a Univision TV infomercial and an advertisement on the Spanish-language radio station 1600 AM.

Josue and Clara Garcia paid Respondent David Zak a total of $6,000 for a loan modification which they never received.

Josue Garcia went to Attorney Zak's office in Revere in December 2009. The Garcias already had a modification on their first loan but were seeking a modification on their second loan. At the first meeting, Josue Garcia was told by Lisette Nieto, an employee of Attorney Zak, that Attorney Zak could get a better modification on the first loan and that no payments would have to be made on the second loan. She said, "don't worry, we've done much more difficult cases." Lisette Nieto required payment of $6,000 before Attorney Zak could start work on the case.

Josue and Clara Garcia paid $6000 in March 2010 and started calling Attorney Zak's office every week to check on the status of the case. They were always told that Attorney Zak was working on it.

In the fall of 2010 Josue and Clara Garcia received a foreclosure notice with an auction date in November. They met with Zak in October and he described two options: either go to court or file for bankruptcy to stop the foreclosure. He required an additional $3,000 payment for either of these services.

In November or December of 2010 the Garcias met with Attorney Zak again. They requested that Zak return their payments because Zak did not do what he

agreed he would do. Zak became angry and said, "You Hispanics are ignorant." He blamed the Garcias for the fact that they did not get a modification. He said, "All you are stupid, you don't do what I tell you to do." Josue and Clara Garcia tried to continue the discussion but he threatened to call the police. He said, "for things less than this I have called the police on clients."

Josue Garcia also wrote a letter in English to request an invoice from Attorney Zak. To date, Josue Garcia has not received an invoice.

In January, 2011, the Garcias had to pay another lawyer to file bankruptcy in order to save their home.

2.    Jose Alvarez

The Complainant, Jose Alvarez ("Alvarez"), is a Latino individual residing at 77-R Beach Street, Revere, MA 02151. He is a native of El Salvador and does not speak or read English.

In 2010 Alvarez owned two properties-a home at 77-R Beach Street, Revere where he lived with his partner and their disabled son, and a rental property at 177 Webster Avenue, Chelsea.

Alvarez heard Attorney Zak's advertisements on the Spanish-language radio station 1600 AM and sought out Attorney Zak for loan modification services.

Alvarez paid Respondent Attorney Zak a total of $12,600 for loan modifications on both his properties, including the rental property that he did not live in. Attorney Zak knew or should have known that property other than primary residences were not eligible for HAMP modification. Alvarez got a HAMP modification for the home at Beach Street, but he had to arrange a short sale of the Webster Avenue rental property in order to avoid foreclosure.

Alvarez first went to Zak Law Office in Revere in April, 2009. He met with Evelyn Aguirre, who was employed by and/or acting as an agent of Attorney Zak. At this meeting, Ms. Aguierre told Alvarez that Attorney Zak would successfully get a modification for the mortgages on both the Beach Street and Webster Avenue properties.

For these services, Alvarez was instructed to pay Attorney Zak $10,600. Ms. Aguirre told Alvarez that Attorney Zak wins most cases, and that Alvarez should feel reassured because he had a "team of attorneys" who were very well prepared to deal with anything. At that meeting Alvarez paid $5,000 divided into two checks-one for each property, and he paid the rest of the money over the next three months, for a total of $10,600.

Attorney Zak and/or his agents knew that one of the properties was a rental property and that it was not a primary residence. Jose Alvarez brought in rent receipts for both of the units in the Webster Avenue property, and his bank statements and paystubs, which listed the Beach Street property as his residence. Ms. Aguierre assured Alvarez that Attorney Zak could get a loan modification for the rental property

Alvarez got an offer of a HAMP modification on May 29, 2010 for the Beach Street property. However, when Alvarez later informed Attorney Zak that the Webster Avenue property was facing foreclosure, Attorney Zak demanded an additional $2,000 to continue representation. On June 29, Jose Alvarez paid $2,000 in cash.

On July 20, 2010, Alvarez sent a letter to Attorney Zak requesting a copy of his file.

Alvarez explained that he wanted to seek new representation and the request was urgent because the Webster Avenue property had an auction date of August 9th Alvarez did not receive his file. Ultimately, Alvarez arranged a short sale of the property to avoid foreclosure.

In September 2010 Alvarez filed a complaint with the Office of the Bar Counsel about his experience with Attorney Zak. On September 22, 2010, at their suggestion, Alvarez sent another letter demanding his file, an itemized bill, and return of unearned fees, but he has received no response.

3.    Edgar Bolivar and Mariela Castaneda

The Complainants Edgar Bolivar and Mariela Castaneda ("Bolivar and Castaneda") are Latino individuals residing at 69 Sagamore Street, Dorchester, MA 02125. They are originally from Columbia and do not speak or read English well. They own their home at 69 Sagamore Street in Dorchester, where they live with their three children.

Bolivar and Castaneda heard Attorney Zak's advertisements on a Spanish language radio program. In his ads, Attorney Zak claimed that banks are very difficult to negotiate with and he fights for people to get what they need to stay in their homes. He listed the names of clients whom he had helped get modifications. All of the clients' names were Latino.

Bolivar and Castaneda paid Respondent Zak $5,000 to get a HAMP loan modification.

However, they were rejected several times for a HAMP modification due to incomplete paperwork. In the fall of 2010, Bolivar and Castaneda began to

4

communicate directly with the bank, and they received an in-house modification in January of 2011.

Bolivar and Castaneda were promised they were eligible for a HAMP modification by Zak's employee Eliza Morales. She said they could lower their mortgage interest rate from 7 percent to 2 percent. Ms. Morales said the modification application and approval process would take 5-6 months. Bolivar and Castaneda paid $2,500 at the first meeting on September 26, 2009.

In December, someone from Attorney Zak's office called Bolivar and told him to pay the rest of the money so that they could start to work on his case. On December 29, 2009, Edgar Bolivar paid the remaining $2,500 to Attorney Zak, for a total of $5000.

On January 4, 2010, Attorney Zak sent a demand letter to Wells Fargo on behalf of Bolivar and Castaneda. Attorney Zak based his letter, in part, on a *proposed* state law.

Attorney Zak submitted three HAMP applications on behalf of Bolivar and Castaneda.

They were all rejected as being incomplete. The first appears to have been submitted in March, 2010, almost six months after initially retaining Attorney Zak.

In July 2010, Bolivar still had not received a modification. Nonetheless, he received a letter, dated July 15, 2010, from Zak Law Offices PC. The letter stated that they had "pre-qualified [him] for a loan modification ... performed forensic analysis of [his] mortgage documents, submitted a Demand Letter ..., and submitted a HAMP loan application package to [his] mortgage company." The letter also stated that "this law firm's engagement in connection with the negotiation of your loan modification with the loss mitigation department of your mortgage servicer has formally concluded." The letter also states that Wells Fargo failed to respond to the HAMP applications. This statement was false. Bolivar and Castaneda's file contained rejection letters from Wells Fargo dated shortly after the applications were submitted.

The rejections were based on Zak's failure to include documents that he knew or should have known were necessary for favorable treatment of the HAMP application. Despite having sent the closing letter, Attorney Zak's office continued to work with Bolivar and Castaneda until February 2011, apparently with no awareness of the letter the office sent.

Bolivar began to communicate directly with the bank in fall of 2010. Bolivar and Castaneda received a non-HAMP modification in 2011. This was the result of their own efforts, not because of any effort by Attorney Zak.

In or around February 2011, Bolivar went to Attorney Zak's office with the modification offer he received from the bank. Bolivar met with Attorney Zak for the first time, about 16 months after retaining him. Attorney Zak called one of the negotiators who worked for him (Ghandi Gracia), and asked why Edgar Bolivar and Mariela Castaneda had not qualified for a HAMP modification. Then they called the bank to see if they could negotiate better terms. Attorney Zak told Bolivar to come back the next day. Bolivar came the next day and Attorney Zak told him that the modification offer was the best that he could get, and that Bolivar should accept it. Bolivar was upset because Attorney Zak's office promised to get a HAMP modification, and that is why Bolivar paid him.

On February 4, 2011, Ms. Castaneda wrote to Attorney Zak and requested her file.

Attorney Zak sent the file, including time records documenting 10.5 attorney hours, on February 25, 2011.

4.   Nery Castro

The Complainant, Nery Castro ("Castro"), is a Latino individual residing at 35 Sagamore Avenue #1, Chelsea, MA 02150. He is a U.S. citizen from El Salvador and speaks English, Spanish, and Portuguese. Castro owns his home at 35 Sagamore Avenue in Chelsea, where he has lived with his wife and their 12 year old, 5 year old, and 1 and ½ year old children, since March of 2000. Castro paid Respondent David Zak a total of $5,600 for a loan modification which he never received.

In the morning, Castro and his wife often listened to a Portuguese language program called Radio do Povo on 1360 AM, and Attorney David Zak was a frequent guest. Attorney Zak would advertise his services and take questions from callers. He claimed that he had twenty lawyers working for him and that he was the only lawyer in Massachusetts who could obtain loan modifications. Attorney Zak said he was successful in 100% of his cases. He said that the head of Bank of America was afraid of him. He listed the names of his clients and described the modifications he got for them.

Castro went to Attorney Zak's Revere office in early summer 2009. He met with a young woman who told him that because he was not yet behind on payments, the bank would not be interested in negotiating a modification. She told Castro to come back in a few months when he was behind on mortgage payments.

Castro began making partial payments on the mortgage after that meeting. He paid About $200 less than he owed each month. On August 21, 2009, Castro returned to the Revere office of Attorney David Zak and met with Ms. Beatriz Gomez, another young woman who worked in that office. At

6

that meeting, Castro filled out what he understood to be an application for a modification. He asked Ms. Gomez who would be in charge of his case, and Ms. Gomez introduced Castro to Attorney Zak.

In response to Castro's concerns about how the modification would work, Attorney Zak responded, "don't worry, I'll get you a HAMP modification." Attorney Zak told him that he would get a modification that reduced the interest rate to 2.5-3.5 percent for the first few years, then it would be 4.75 percent for the remaining life of the loan. Attorney Zak also promised to get the principal reduced by half.

At that meeting, Castro paid Attorney Zak $2,000 in cash and wrote a personal check for $500. On October 7, 2009, Castro paid another $3,100 in cash, for a total of $5,600.

In February or March, 2010, Castro read in the Chelsea paper that his home was scheduled to be sold at auction. He called Attorney Zak's Revere office and told them. Attorney Zak's office was surprised because they did not know about it. The foreclosure did not occur.

Almost a year after hiring Attorney Zak, Castro began to hear stories in his community that Attorney Zak was not helping people the way that he promised to. In the summer of 2010, Castro called Attorney Zak's office to get an update, and spoke with Diego Garcia. Mr. Garcia told him that the bank had offered a modification on March 10, 2010. This was the first time anyone had told Castro about the modification. Castro asked for a meeting with Attorney Zak to find out exactly what was happening with the case.

On July 13, 2010, Castro met with Attorney Zak, which was the second and last time he ever spoke with him. The meeting was for 11 am in the Needham office. Castro arranged to take the day off of work to meet with Attorney Zak. The morning of the appointment, someone called from the office and tried to cancel. Castro explained that he needed to meet with Attorney Zak and that he had already arranged to take the day off, and would not be able to do so again. Castro went to the Needham office and waited. All of the clients in the office were Latino or Brazilian. They seemed very upset or disappointed. After almost four hours, Attorney Zak finally met with Castro.

Attorney Zak acted very aggressively. He would not let Castro speak. Attorney Zak listed the things that he had done for Castro, and claimed that he did more than he had charged for.

Castro asked Attorney Zak about the modification offer from the bank, and Zak became even more angry. At first he denied that there was an offer. He said, "stop talking shit," "shut the fuck up," and "nobody told you that, you're lying." Attorney Zack told Castro to go home. He hit his desk with his fist several

times. Then he said, "who told you that? You don't even speak English." Castro
explained that Mr. Garcia had told him in Spanish. Attorney Zak called Mr.
Garcia into the office, and called Becky, one of his negotiators, and put her on
speaker phone. They confirmed that the bank had made an offer for a
modification on March 10, 2010.

Attorney Zak became apologetic at this point. He said, "I'm sorry, I didn't
know." Attorney Zak also said that the bank's offer was not good, and they
should not have communicated it. He said Castro did not qualify for the Obama
plan, and offered to help Castro file for bankruptcy or arrange a short sale.
Attorney Zak wanted more money for this. Castro told Attorney Zak he was not
hired to help with either of those things; only to get a modification.

Attorney Zak promised that he would call Castro in a week with a response
from the bank regarding a better modification offer than that made March 10,
2010. Castro asked Attorney Zak to copy him on all communications with the
bank. The following day, Castro got an email from the lawyer representing the
bank stating that the bank had made a modification offer on March 10, 2010,
and that they had not gotten a response.

In January 2011, Attorney Zak called Castro and asked to meet with him.
Castro did not respond. Castro had retained another attorney for $5,000 to help
avoid foreclosure.

5.      Jose Chavez

The Complainant, Jose Chavez ("Chavez"), is a Latino individual residing at 18
Lynn Street #2, Chelsea, MA 02150. He is originally from El Salvador and
speaks and reads limited English.

Chavez owned and lived in a condominium at 39 Crescent Avenue in Chelsea.
Chavez paid Respondent David Zak a total of $5,190 for a loan modification
which he never received. Instead, Jose Chavez lost his home to foreclosure and
was evicted.

Chavez heard about Attorney Zak from a friend. Chavez was interested in
Attorney Zak's services because Brigham and Women's Hospital reduced his
hours from 40 to 20 hours a week and he started to fall behind on his mortgage
payments.

On October 19, 2009, Chavez met with Attorney Zak's agent, Edgar Pimental,
at the Revere office to seek help with reducing his mortgage payments. At that
time, Chavez was not making payments on his mortgage and was about three
months behind.

8

Mr. Pimental told Chavez that he qualified for a modification and that the fee for Attorney Zak's work was $5,000. When Chavez asked why it would cost so much to get a modification, Mr. Pimental told him that the work was 100 percent guaranteed. Chavez was told that his interest rate would be reduced by 50 percent, 50 percent of his debt would be discharged, and that he should not worry that he had not made mortgage payments. Chavez was told Attorney Zak's office would not start working on the modification until they received the full payment. That day, Chavez paid Zak's office 2,640.00, which was half of the $5,000 fee requested, plus an additional charge for paying by credit card.

In November 2009, someone from Zak's office contacted Chavez reminding him about the second payment, and told him that they would not start the modification application until they had received the full payment. Chavez made the second payment on December 1, 2009: $1,500 by personal check, and $1,050 by credit card. In all, Chavez paid Zak's office a total of $5,190.

On December 4, 2009, Attorney Zak sent a 93A demand letter to Citi Mortgage on behalf of Chavez.

After that, Zak's office did not contact Chavez for several months. Chavez called many times but no one would return calls. Chavez started to receive papers from the bank regarding the delinquency of his mortgage payments. Chavez would call Zak's office asking about the progress of the modification and expressing concerns about the papers he was receiving from the bank, but people in Zak's office would just say not to worry, that they were processing the modification application.

Finally, on July 6, 2010, someone from Zak's office called Chavez, saying it was urgent that Chavez come to the office. Chavez went to Zak's offices in Revere the next day, thinking he would finally receive good news. There were about 20 people, all Latinos, in the office, waiting to meet with Attorney Zak. Many people seemed upset. Attorney Zak called clients in two by two because he did not have time to meet with each individually. In each meeting, he demanded $3,000 from each client. He was aggressive and abusive, and treated people in a demeaning and discriminatory manner.

When Chavez was called in with another client, Attorney Zak told him that a foreclosure sale of his condominium had been set for July 12, only 5 days away. Attorney Zak told Chavez that he could stop the foreclosure sale-but only if Chavez paid an additional fee of $3,000. Chavez refused to pay more. Chavez got up to leave and Attorney Zak called him "stupid" for not paying Zak to save the home. Attorney Zak said this in front of the other client, and Chavez was offended and embarrassed.

Chavez's property was sold on July 12, 2010 for $73,000, while he was still living there.

9

Chavez later received a notice to quit telling him to vacate the property by
September 15, 2010. Chavez did not have an attorney to avoid eviction. As a
result of Respondent Zak's actions, Chavez was forced to move out of his home
and rent an apartment at 18 Lynn Street in Chelsea. It was a basement
apartment infested with roaches, but Chavez did not have time or money to find
something better.

After vacating the Crescent Avenue property, Chavez called Zak's office and
requested his file and his money back. Someone in Zak's office told Chavez
that the retainer agreement says the money is not refundable. Chavez argued
that he was told that Attorney Zak's work was 100 percent guaranteed, and
Attorney Zak had not helped him get a modification. The person on the phone
denied that Attorney Zak's work was guaranteed. Zak's office also said they
would call about returning the case file, but failed to do so.

Later, Chavez received a phone call from Blanca Heredia. Ms. Heredia said she
worked for Attorney Zak, and that she was following up with all the clients
asking why they weren't paying the additional $3,000 when it would be good
for them. She seemed completely unaware of the details of Chavez's situation.
Chavez told Ms. Heredia that his condominium had already been foreclosed
and he had been evicted.

6.    Jose Elmer Diaz

The Complainant, Jose Elmer Diaz ("Diaz"), is a Latino individual residing at
22 Garfield Avenue, Hyde Park, MA 02136. He is originally from El Salvador,
and speaks English fluently.

Diaz went to Zak Law Offices in November 2009 because a friend told him
that Attorney David Zak could help him get a mortgage modification. Diaz paid
Respondent David Zak a total of $8,100 for a loan modification which he never
received. Instead, Diaz lost his home to foreclosure.

When Diaz first went to the office, on November 27, 2009, he met with Lisette
Nieto, who was employed by and/or acted as an agent of Attorney Zak. She
told Diaz that the fee for a loan modification was $5,600. She told him that a
loan modification was guaranteed. She never indicated that it might be
necessary to pay more than that. Diaz could not pay the entire amount at that
time, so he wrote a check for $1,000.

Diaz asked to meet with Attorney Zak in December. They met that month, and
Attorney Zak said the following to Diaz: "I'm not saying don't pay your
mortgage, but if you stop paying, the bank will give you a modification." At
that time, Diaz was current on his mortgage payments. Attorney Zak told Diaz
that if the bank sees current payments on the mortgage, then the bank will not
be willing to negotiate a modification. Diaz's understanding from the statement

was that Attorney Zak was advising him to stop paying his mortgage. Attorney Zak promised to provide Diaz with a loan modification. On December 31, 2009, Jose Diaz paid Attorney Zak another $2,000 in cash. Zak led Diaz to believe that work would begin immediately on the case.

In January of 2010, Diaz, on the basis of Zak's statement that if he fell behind he could obtain a loan modification, stopped paying his mortgage. If Diaz had understood that this would place him at significant risk of foreclosure and eviction, then he would have made a different decision.

Diaz found out in March, 2010, that no work had yet been done on his case. Upon inquiry, Attorney Zak told Diaz that he had to pay the entire fee first. Diaz paid the remaining $2,600 in two installments during that month, for a total of $5,600. According to Attorney Zak's own time records, no work was performed on the case until mid-May, 2010.

At the end of July, 2010, Attorney Zak called Diaz in for a meeting, and told him to declare bankruptcy to save his house, which Diaz refused to do. One week later, Attorney Zak informed Diaz that the bank would be foreclosing on the property in three days, the first time Diaz was notified of the foreclosure from either Attorney Zak or the bank. Up until this point, Attorney Zak had given Diaz the clear impression that the bank would be willing to modify the loan.

After the foreclosure, Attorney Zak continued to represent Diaz, and charged him an additional $2,500. Diaz paid this by check on September 8, 2010. Attorney Zak insisted that he could negotiate a lease from the bank. He told Diaz that after a year he might be able to buy the house back at market value. During the next couple months, Attorney Zak attempted to negotiate a lease of the property for Diaz, but was unsuccessful.

Attorney Zak also made a lackluster attempt to represent Diaz at the eviction hearing. He was so unprepared for court that the judge became angry and told him to leave. Attorney Zak then told Diaz that he refused to work with him further.

On March 24, 2011, Attorney Zak called Diaz and demanded to know why Diaz was communicating with Greater Boston Legal Services. Jose Elmer Diaz suspects the call was in reference to the 93A Demand Letter that Greater Boston Legal Services had sent to Attorney Zak in early March, 2011. He said, "I helped you, and I can keep helping you, why did your lawyers send this letter?" Diaz did not discuss the demand letter with Attorney Zak.

In total Diaz paid Attorney Zak $8,100, did not receive a mortgage modification, and lost his home to foreclosure.

### 7.   Juan Antonio Guevara

The Complainant, Juan Antonio Guevara ("Guervara"), is a Latino
individual residing at 110 Congress Avenue #1, Chelsea, MA 02150. He is
originally from El Salvador, and speaks fluent English. Guevara owned two
properties – his home at 110 Congress Avenue in Chelsea where he lives
with his wife and three children, and a rental property at 31-33 Belmont
Avenue in Haverhill. He paid Respondent David Zak a total of $11,170 for two
loan modifications.

Guevara was behind on the mortgage on his Chelsea home as well as behind on
two loans on his Haverhill house when he sought Attorney Zak's loan
modification services.

Guevara found out about Attorney Zak from his friend Elisa Morales, who
worked for Attorney Zak. She came to Guevara's home and as Attorney Zak's
agent, and she gave a presentation of Attorney Zak's services for Guevara and
his wife. Ms. Morales told them that Attorney Zak worked with a team of
lawyers and had a strategy for saving people's houses.

Ms. Morales stated the legal strategy was to first negotiate with the lender to
get a modification of the client's mortgage. If that was unsuccessful, they
would sue the lender. Finally, if that was not successful, they assisted the client
in declaring bankruptcy. Guevara was interested in Attorney Zak's services for
both of his properties. Ms. Morales told Guevara that the cost of retaining
Attorney Zak for both properties was $5,500 per house. Guevara asked if it
would be necessary to pay more in the future, and Ms. Morales assured him
that the fee covered the entire cost of "saving" his houses.

Ms. Morales came to Guevara's home a second time, at which point he and his
wife agreed to retain Attorney Zak. Guevara paid $5,585, in 3 charges on his
credit card, on March 18 and 19, 2009. Juan Antonio Guevara understood this
amount to be half of the payment, and Ms. Morales told him that her office
would begin to work on the case, and that Guevara should pay the second half
after they do the work.

Guevara went to Attorney Zak's Revere office every two to three weeks to ask
about the status of the case, but he did not get to speak with Attorney Zak.
Usually Guevara spoke with either Ms. Morales or Jhonny Palacios, and
sometimes Lisa Reed. Whoever Guevara spoke with always assured him that
they were working on his case and that he should just wait. Guevara also called
the office often, but would often not get called back.

On April 10, 2009, Guevara paid another $2,950 to Zak Law Offices, in 2
charges to his credit card. On June 12, 2009, Guevara made yet another

payment of $2,635 to Zak Law Offices. In total, Guevara paid $11,170 to
Attorney Zak.

On October 23, 2009, Guevara received a modification offer on his Chelsea
home from GMAC with reasonable payments for two months then a balloon
payment of $66,458.30 in the third month. Attorney Zak made a counteroffer
accepting the lower monthly payments without the balloon payment on October
28, 2009.

By October 2009, Guevara was getting nervous about the prospect of getting a
modification on his Haverhill property, and he arranged for a short sale without
the knowledge of Attorney Zak. After the short sale, Guevara asked Attorney
Zak for his money back. Guevara's wife threatened to take their story to the
media if Attorney Zak did not return the money. Attorney Zak claimed that he
had made phone calls and faxes on Guevara's behalf, so he would not return all
of the money. He returned $2,300 out of the $5,600 that Juan Antonio Guevara
paid him to "save" the Haverhill rental property.

In August, 2010, Guevara met with Attorney Zak directly for the first time.
Guevara had received a foreclosure notice for his Chelsea home dated August
23, 2010, with an auction date of September 2, 2010. Guevara asked Attorney
Zak what he was going to do about the auction. Attorney Zak told him not to
worry, that the strategy was to wait until the last minute.

On August 27, 2010, Guevara met with Attorney Zak a second time. There was
another client scheduled to meet with Attorney Zak at the same time, and
Attorney Zak decided to meet with both clients at the same time. During this
meeting there was another lawyer on speaker phone. When she became aware
that Attorney Zak was meeting with two clients at once, she told him that this
was unprofessional, and that he should apologize. Attorney Zak apologized.

At this meeting Attorney Zak requested additional $3,000 from Guevara to save
his house. Guevara said the agreement was he would not need to pay more
money. Attorney Zak responded that his job was done. Attorney Zak gave
Guevara two options –he could sue the bank to stop the foreclosure or he could
file Chapter 13 bankruptcy. Attorney Zak said that if Guevara did not pay, the
property would be sold at auction. Attorney Zak told Guevara to come back on
August 31 with the money and a decision.

On August 30, 2010, Guevara sent a letter to Attorney Zak explaining that he
was dissatisfied with these options. In his letter, Guevara stated that he had
several times been assured that he would not need to pay more money for court
representation, and that Attorney Friedmann would represent him in court.
Guevara also requested a copy of all communications with his bank, and asked
for a full refund.

13

Guevara met with Attorney Zak a third time to tell him that payments had ended, and he did not want Attorney Zak to represent him anymore. Guevara requested a refund of payments. Attorney Zak wanted to refer Guevara to another lawyer in Malden, but Guevara informed Zak he had already retained another lawyer. Attorney Zak acted angry, and insisted on knowing who the new attorney was, and proceeded to call her. Attorney Zak put the new attorney on speaker phone and asked her, "did you know that Mr. Guevara was *my* client?" The attorney responded that she did not, but that Guevara had a right to go elsewhere, and she had every right to accept him as a client.

Despite the written request of August 30, 2010, Guevara did not get a copy of Attorney Zak's communications with his bank, and did not get a refund.

In March, 2011, Guevara obtained a modification of the mortgage on his Chelsea home with the help of his new attorney. He paid her $1,400 to appear in court and stop the foreclosure, and $2,500 to negotiate the modification.

8.   Ronaldo Gutierrez

The Complainant, Ronaldo Gutierrez ("Gutierrez"), is a Latino individual residing at 28 Covell Street, Providence, Rhode Island 02909. He is originally from Guatemala, and speaks and reads only limited English. He owned his home on 29-31 Sorrento Street in Providence, Rhode Island. Gutierrez paid Respondent David Zak $8,000 for a loan modification which he never received. Attorney Zak later returned $4,000.

In the spring and summer of 2009, Gutierrez was having trouble making his mortgage payments. In July 2009, his lender notified him that it would foreclose on his home. His lender also offered a modification under the "Obama Plan" (RAMP), but Gutierrez understood the modification would only last two years and the terms offered were not enough to make the mortgage affordable.

In August 2009, Gutierrez heard a radio advertisement for the Loan Modification Group on the Spanish-language radio station 100.3 FM from Providence. In the advertisement, a man identified as David Zak said that he had the expertise and knowledge to help people save their homes, even if they were in foreclosure.

Gutierrez went to the Loan Modification Group office in Revere and met with Beatriz Morales, an agent of Attorney Zak. Gutierrez told her that his mortgage was already in foreclosure and told her about the modification his lender had offered. Ms. Morales told Gutierrez that Loan Modification Group would stop the foreclosure and get him a modification with better terms than the one his lender had offered. She said they had helped several other people in the same situation.

14

Gutierrez brought the required documents to a second meeting with Ms. Morales at an office in Providence. Ms. Morales called David Zak and he spoke with them by speaker phone. Attorney Zak said he would be able to reduce the balance of Gutierrez's mortgage to the current value of the home and obtain a permanent modification with a thirty year term and a fixed interest rate. Around the same time, Gutierrez also spoke with other organizations that said they could help obtain a HAMP modification. Because Attorney Zak had said he could get a better modification than the "Obama Plan," Gutierrez chose to work with him.

Attorney Zak said that because Gutierrez's home was already in foreclosure, and because he would have to consult with another attorney, that the services would cost $8,000. When Gutierrez told Attorney Zak that he did not have $8,000, Attorney Zak suggested that Gutierrez use his credit card. Attorney Zak said he would only allow two installments: $4,000 immediately and $4,000 fifteen days later.

Gutierrez took money from his 401K account and four days later delivered a check to Loan Modification Group for $8,000 and signed all the forms they presented. At that time, Gutierrez noticed that most of the clients in the Revere office were Latino.

Two weeks passed after Gutierrez provided payment and signed the contract, but he did not hear anything from Loan Modification Group. Gutierrez called to ask about the status of the modification. The person Gutierrez spoke with said she would find out and call back. Two or three days later, she called and told Gutierrez that the paperwork was still being processed and that Attorney Zak would call in a few days with an update.

Two days later, David Zak called and told Gutierrez that he was with representatives of the bank. He said, in an aggressive way, that there were only two options: The first option Attorney was to pay the court $2,000 per week for six weeks and then the lender would provide a modification. The second option was to file for bankruptcy. Attorney Zak would not explain or discuss these options. Instead, he simply said, "this is your problem, not my problem," and he told Gutierrez to "call back in thirty minutes with your decision."

Gutierrez called Attorney Zak back in thirty minutes and explained that he could not afford to pay $2,000 per week to the court and that he didn't want to file for bankruptcy. Attorney Zak responded "do as you please, my work ends here," and ended the conversation.

Later that same day, Gutierrez's lender called to ask if he was going to accept the modification that had previously been offered. Gutierrez was surprised because the lender did not seem aware that Attorney Zak had supposedly been talking to them 2 hours earlier. Gutierrez refused the modification because he

believed Attorney Zak was in the process of negotiating a different modification. The lender representative did not know who David Zak was. The lender stated someone from Attorney Zak's office, but not David Zak, had contacted the lender twice, but only for the purpose of getting information about the mortgage, not to stop the foreclosure or to negotiate a modification. The representative also said that their offer was the absolute lowest offer possible.

Immediately after this call from the lender, Gutierrez called Ms. Morales to relate what the lender stated and to demand a refund. Ms. Morales said she would speak with Attorney Zak about it.

The next day, Ms. Morales called and said that "Mr. Zak had done a lot of paperwork for the case and had contacted many lawyers" and that he would charge $4,000 and refund $4,000.

When Gutierrez had not received the refund within a few weeks, he called Attorney Zak's office again. The person Gutierrez spoke with said the check was in the mail. After that Gutierrez received two checks from Attorney Zak totaling $4,000.

In October 2009, Gutierrez lost his home to foreclosure and had to move.

9.      **Marlon Hernandez**

The Complainant, Marlon Hernandez ("Hernandez"), is a Latino individual residing at 31 Silver Street, Malden, MA 02148. He is originally from El Salvador, and owns his home at 31 Silver Street in Malden, where he lives with his wife and 3 children.

Hernandez paid Respondent David Zak a total of $5,600 for a loan modification which he never received.

In March 2009, Hernandez heard about the Loan Modification Group from an acquaintance who said that Loan Modification Group promised to obtain modifications.

Because Hernandez was concerned about losing his house and had been unable to obtain a modification on his own, he called and arranged to meet with a representative of Loan Modification Group.

At that meeting, which occurred at or about the end of March 2009 or beginning of April 2009, the representative, named Elisa Morales, told Hernandez that Attorney Zak and Loan Modification Group worked closely with attorney Jonathon Friedmann of the law firm Rudolph Friedmann. She showed Attorney Friedmann's website and said that Attorney Friedmann was one of the best

lawyers in Massachusetts and that Attorney Friedmann would help represent Marlon Hernandez if he had to go to court.

Ms. Morales explained that the lender was required to respond within 30 days and that if the lender did not offer a modification that Attorney Friedmann and Attorney Zak would sue the lender to force the lender to offer a modification. Ms. Morales said that having Attorney Friedmann's assistance would usually cost a lot of money, because Hernandez would have to pay an hourly rate and that suing the lender would require Attorney Friedmann to go to court many times. Ms. Morales then explained that instead of an hourly rate, they had an arrangement whereby the loan modification application, negotiation, and any necessary court appearances would be covered by one flat fee.

After Hernandez gave Ms. Morales information about his loan and his house, Ms. Morales promised him that Loan Modification Group and Attorney Zak would be able to negotiate a loan modification with a fixed interest rate between 2 and 4 percent, a 30 to 40 year repayment period, and a reduction in the principal balance of the loan from $339,348 to the market value, which Ms. Morales said was between $225,000 and $255,000. Ms. Morales also told Hernandez that their job would not be finished until they obtained the modification. By the end of the meeting, Hernandez was convinced that he should hire Attorney Zak and Loan Modification Group because they had guaranteed that they would negotiate a favorable loan modification.

Ms. Morales explained that Attorney Zak and Respondents charged different fees, ranging from $5,000 to $8,000, depending on how many mortgages are on the home, how many lenders are involved, and whether foreclosure or short sales are concerned. Hernandez told Ms. Morales that he did not have enough money at that time, but that he was anxious for them to start as soon as possible. Hernandez explained that he could pay a deposit at that time and that he would receive his tax refund soon and would use that to pay the remainder. Ms. Morales explained that they would not start working on the case until they had received the full payment. When Hernandez said he thought advance fees were against the law, Ms. Morales responded that attorneys, such as David Zak, were allowed to take advance fees.

Shortly after that meeting, on or about April 3, 2009, Hernandez received a letter from a law firm stating that the firm had been retained to foreclose on his house. After receiving this letter Hernandez called Ms. Morales and asked to meet with her to discuss the letter.

Ms. Morales called Hernandez on Sunday, April 5, 2009, and invited him to come to the office that day. Ms. Morales called Attorney Zak by phone to determine how to proceed. Attorney Zak explained that because Hernandez had received a letter regarding foreclosure, they required a fee of $5,600,

At that meeting on April 5, 2009, Hernandez agreed to pay Attorney Zak and Loan Modification Group $5,600 to obtain a loan modification and deal with the foreclosure. After making this payment, Hernandez received a letter dated April 13, 2009, from Loan Modification Group and Zak Law Offices PC thanking Hernandez for hiring them. The letter was accompanied by a Lender Benefit Analysis and a Loan Audit Report. The letter also stated that after payment of all fees, the audit report and loan documentation would be forwarded to the team of attorneys to begin negotiating the modification.

Shortly thereafter, Hernandez received a copy of a letter dated April 21, 2009, from Jonathon Friedmann to his lender. The letter requested a modification of the loan and claimed that the lender had violated state and federal laws when they issued the loan.

The letter also requested a response from the lender within 30 days. Hernandez never spoke with Attorney Friedmann or anyone from Rudolph Friedmann, and no one from Rudolph Friedmann ever represented Hernandez in court. More than thirty days passed after Jonathon Friedmann's letter of April 21, 2009, and Hernandez did not hear anything from his lender.

During the next year, Hernandez contacted the Loan Modification Group many times to ask about the progress on his loan modification. Each time, representatives of Loan Modification Group asked him to send them updated bank statements, W2's and other documents. They kept requesting the same documents and Marlon Hernandez was concerned that they were not actually working on his case.

In July 2010, over a year after Hernandez had signed the contract and paid the fee, he still had not received a modification. Nonetheless, Hernandez received a letter, dated July 8, 2010, from Zak Law Offices PC. The letter stated that they had "pre-qualified [Hernandez] for a loan modification ... performed forensic analysis of [his] mortgage documents, submitted a Demand Letter ... and submitted a HAMP loan application package to [his] mortgage company." The letter also stated that "this law firm's engagement in connection with the negotiation of your loan modification with the loss mitigation department of your mortgage servicer has formally concluded."

On July 13, 2010, Hernandez wrote to Attorney Zak by certified letter and called several times to request a meeting with Attorney Zak in order to discuss the letter, the progress on the modification, and the letter's claim that Attorney Zak's services were concluded. Although the letter was confirmed as delivered, Hernandez received no response. On the phone, several of

Zak's representatives tried to argue he did not need a meeting with Attorney Zak and claimed that the letter their office sent was "routine."

18

Hernandez finally was given a meeting with Attorney Zak on August 13, 2010. The meeting on August 13, 2010 was the first time he had actually spoken with Attorney Zak about the loan modification. At that meeting, Hernandez explained his concerns about the letter asked after the status of the loan modification negotiations. Attorney Zak claimed that they had done what they were required to do and that additional services would require additional payment.

Attorney Zak also said that he would represent Hernandez for free in a suit against the Loan Modification Group employee, Elisa Morales. Hernandez explained that he did not think Zak's job was "formally concluded" as it stated in the letter because he had not received the modification they had promised. At this point in the conversation, Attorney Zak slid his chair across the floor, leaned in face-to-face with Hernandez, and said "I don't give a damn what you think." Hernandez asked Attorney Zak to refund the $5,600 payment. Attorney Zak said that he was the attorney and that he will always have the advantage. He then said "I am done with you" and started talking on the phone

After the August 13, 2010 meeting, Hernandez wrote two more letters to Attorney Zak, each of which were sent by certified mail to both the office at 701 Broadway, Revere, MA and the office at 200 Highland Ave., Needham, MA, and all of which were confirmed as delivered. In the first letter, dated August 18, 2010, Hernandez requested that Attorney Zak either refund the money or confirm that he would continue representation. Hernandez received no response to that letter. In the second letter, dated September 20, 2010, Hernandez advised Attorney Zak that he had received notice that his lender was initiating foreclose. Hernandez again asked him to either refund the money or continue representation. Hernandez received no response to that letter either.

On October 16, 2010, Hernandez received another letter from Harmon Law Offices notifying him that a foreclosure auction was scheduled for November 16, 2010. Hernandez then contacted the Attorney General's Office on October 19, 2010 to submit a complaint about Attorney Zak and to seek help with his mortgage. He authorized the Attorney General's Office to contact his lender. On October 23, 2010, Hernandez received another letter from Harmon Law Offices notifying him that the foreclosure auction had been postponed until January 4, 2011.

On December 14, 2010, after the Attorney General's Office intervened on Hernandez's behalf and after he had sent his financial information directly to the lender, Hernandez was denied a loan modification.

On December 15, 2010, five months after Attorney Zak's letter stated that his services were formally concluded, and less than three weeks before the scheduled foreclosure date, Hernandez received a call from a woman working for Attorney Zak. She asked for additional paystubs and financial information. Hernandez was surprised because he had not heard anything

19

from Loan Modification Group or David Zak since the August 13 meeting and because his foreclosure date had almost arrived. Hernandez asked her if she knew that his foreclosure date was on January 4, 2011. She said yes and that was why it was important Hernandez to provide this information.

On December 16, 2010, Hernandez received a voicemail and a letter from Attorney Zak requesting that he make an appointment. In this letter Attorney Zak claimed that he was still negotiating a loan modification, which is contrary to what the lender stated. Furthermore, Attorney Zak claimed that he tried to contact Hernandez on multiple occasions. However, since the meeting on August 13, 2010, Hernandez did not hear from Attorney Zak or any of his employees until December 15, 2010.

After Hernandez hired Attorney Zak, he saw commercials advertising the Loan Modification Group and Attorney Zak on the Spanish TV Station, Univision. In these commercials various Spanish speaking people give testimonials claiming that Attorney Zak got them a loan modification. Hernandez recognizes some of the people in these commercials as employees of David Zak.

In December 2011, Hernandez got a another letter informing him of foreclosure with an auction date of January 4, 2011. Hernandez filed bankruptcy because he saw no other option to stop the foreclosure. He paid another lawyer $2,400 to file bankruptcy.

10.    Petronila Martinez

The Complainant, Petronila Martinez ("Martinez"), is a Latino individual residing at     968 River Street, Hyde Park 02136. She is originally from the Dominican Republic and speaks and reads some English. She owns her home at 968 River Street in Hyde Park, where she lives with one of her sons. Martinez experienced financial difficulties because her ex-husband stopped making mortgage payments.

Martinez paid Respondent David Zak $2,500 for a loan modification which she did not receive.

Martinez was familiar with Attorney Zak because her ex-husband had obtained a refinance with his office in 2006 and her niece was working for him at the time. She also saw TV and radio ads for the Law Offices of David Zak on Spanish language stations.

Martinez first went to Attorney Zak's Revere office in early 2010, and met with Elisa Morales, an employee of Attorney Zak. She told Martinez about Attorney Zak's services and stated it would cost $5,000 to retain him.

20

Martinez's niece worked for Attorney Zak, so she was able to get a 50 percent discount on Attorney Zak's fee when she returned to his office on April, 2010. Martinez explained to a woman at Attorney Zak's Needham office that her case was different because it had taken her one year to get a divorce from her husband and during that time he did not pay the mortgage. It was difficult for Martinez to interact with the lender because her name was not on the account, although she was on the deed. The woman in Attorney Zak's office said, "don't worry, that's not a problem." She guaranteed that Attorney Zak would provide a HAMP modification.

After the first meeting, Martinez usually interacted with and gave documentation to Diego Garcia, an employee of Attorney Zak. Martinez recognized Mr. Garcia as one of the people in Attorney Zak's TV advertisements. In the advertisements, Mr. Garcia claims that he owns a house, and that Attorney Zak helped him obtain a modification.

Attorney Zak's office only reported half of the rent that Martinez collect for her property, even though she brought in the documents to show all of the rent that she received.

Martinez had a lot of difficulty getting anyone at Attorney Zak's office to meet with her or return phone calls. During one week the entire phone system in Needham did not work, and no one picked up the phone.

Attorney Zak wrote a 93A demand letter to Martinez's lender on May 7, 2010. The letter was incomplete and Martinez does not know if Attorney Zak ever sent it.

In July, Martinez received a foreclosure notice with an auction date of August 5, 2010.

She could not get an appointment with Attorney Zak so she went to his office and waited for him on August 3. He was angry at Martinez for coming without an appointment, and yelled, "I can do nothing for you." He told Martinez that the only option was to file for bankruptcy, and he gave her another attorney's phone number.

Martinez went to a different attorney who stopped the August 5 foreclosure, and she stopped working with Attorney Zak. Martinez called Attorney Zak's office in mid- August and asked for her money back. Mr. Garcia would not let her speak with Attorney Zak, and told her that they would not refund the payments.

Martinez is currently working with a bankruptcy attorney to whom she paid an Additional $7000.

11.    Magdalena Morales

The Complainant, Magdalena Morales ("Morales"), is a Latino individual
residing at 51 North Federal Street, Lynn, MA 01905. She is originally from
Mexico, and speaks and reads English fluently. She owns her home at 51 North
Federal Street in Lynn. She paid Respondent David Zak a total of $5,000 for a
loan modification. The modification that Attorney Zak obtained for her had the
exact same terms as one she negotiated without his assistance, even though he
promised that he could get a better modification.

Morales began experiencing financial difficulties in 2009, applied for a
modification, and received an offer of a modification early in 2009.

Magdalena Morales was friends with Elisa Morales, who referred her to
Attorney Zak. In February of 2009, Morales hired Attorney Zak to negotiate a
better modification. She met with Attorney Zak and Lisa Reed, who works for
Attorney Zak, that month, and they promised to cut her principal in half.
Attorney Zak claimed to be the only lawyer who could accomplish this.
Attorney Zak charged $5,000 for his services, with $2,500 demanded prior to
commencing work on the modification.

After several months, Attorney Zak informed Morales about a new modification
with the exact same terms as the modification she had negotiated on her own.
Attorney Zak instructed Morales to make 3 monthly trial plan payments
beginning in August 2009, despite protests that this modification mirrored the
one she had negotiated. Morales felt pressured to accept the modification
against her wishes.

On November 6, 2009, Morales met with Attorney Zak. She had paid the 3
month trial plan, and Attorney Zak told her not to make any more payments to
the bank until she had the contract for a permanent modification.

Morales could not meet with Attorney Zak for the rest of November because she
gave birth to a daughter on November 12, 2009. She wrote Attorney Zak a letter
in early December informing him that she still had not received a contract from
the lender for a permanent modification.

On December 11, 2009, Morales met with Attorney Zak, who explained she had
been disqualified for a HAMP for nonpayment under the trial plan. He blamed
Morales, and accused her of misunderstanding his earlier instruction to stop
paying, because she does not "understand English." Morales was very insulted
and felt that Attorney Zak treated her in a discriminatory and demeaning manner
because she is Latino.

In January, Morales borrowed $3,450 from her brother-in-law in order to catch
up on mortgage payments. Attorney Zak told Morales that he would try to

22

continue negotiating with the lender. Morales was concerned about whether or not he would do this, so she also started communicating with the lender individually.

On April 15, Morales met with Attorney Zak in Needham. Her house was going to be foreclosed in 2 or 3 days, and Attorney Zak demanded an additional $5,000 payment to hire another attorney to work on the case. He said, "do you want to save your house? You have to give me money if you want to save your house." Morales told Attorney Zak that he needed to finish his work, and that she would not pay him more money. Morales said that if he was not going to finish the case, then he needed to give the money back. Attorney Zak refused, and said that the work that he did was worth $20,000. Morales also requested her file from him. He said that he would send it in a week. He went to the computer where he was talking on Skype with Lisa Reed, one of his employees. He said to her, "Ms. Morales is ending her work with us, she is going to either do it herself or hire a different lawyer." Morales said to him, "That's not what I said. I said you're supposed to finish your work for me." Attorney Zak got very angry at this point, and his face turned red. He turned and said, very aggressively, "You know what? My relationship with you is done. Get out of my office."

Soon after that, Morales sent Attorney Zak a letter in which she requested a refund of her money and her client file, which Attorney Zak has not yet sent. Morales explained that she felt he forced her to accept the modification that he negotiated even though it was not any better than the one she negotiated. She told him that she no longer wanted him to represent her. Attorney Zak later sent an itemized bill for $10,350 for 20.7 hours worked on the case from March 2009-April 2010, in addition to the client file.

Morales later negotiated a modification from the bank on her own and reported Attorney Zak to the Attorney General's Office.

12.    Gerardo and Blanca Ortiz

The Complainants Gerardo and Blanca Ortiz (the "Ortizes") are Latino individuals, originally from Guatemala, and speak and read some English. The Ortizes owned their home at 157 Arlington Street in Framingham and lived there with their three children.

The Ortizes paid Respondent David Zak a total of $7,600 for a loan modification which they never received.

The Ortizes learned about Attorney Zak and the Loan Modification Group from their friend Elisa Morales, who worked for Attorney Zak. On May, 26, 2009, the Ortizes met with Ms. Morales at Attorney Zak's Needham office. She told them that Attorney Zak's office could get a mortgage modification, reduce the

amount of the payments for the mortgages, and combine the two mortgages into one mortgage.

The Ortizes hired Attorney Zak after that. They made the first payment of $2,500 to Zak's office on June 8, 2009, and made another payment of $3,100 on August 4, 2009.

In or around June or July, Lisa Reed, an employee of Attorney Zak, told the Ortizes that in order for them to get the best results, they should stop making all payments on both mortgages.

On or around April 8, 2010, the Ortizes started to receive notices from the law offices of Orlans Moran that the lender intended to foreclose on their property in May 2010.

In order to prevent the foreclosure, Attorney Zak drafted-but did not file-an Attested Complaint, which Attorney Zak sent to the lender. Attorney Zak demanded an additional fee for this service, and the Ortizes paid his office $2,000 by check, on June 30, 2010. In total, the Ortizes paid Attorney Zak's office $7,600.

The Ortizes kept receiving notices about a foreclosure of their home, although the foreclosure date was delayed a few times. When the foreclosure date was finally set for September 2010, Attorney Zak advised the Ortizes to file for bankruptcy. But Attorney Zak requested an additional $2,500 to hire an attorney to handle the bankruptcy. The Ortizes refused.

The lender foreclosed on the Ortizes' home on September 8, 2010. Afterward, they continued to live on the property. After the foreclosure, the Ortizes made many attempts to get in contact with Attorney Zak, by writing letters and calling his office. In October 2010, with the help of their niece, Heyrni K. Ruano, who is fluent in English, the Ortizes wrote a letter to Attorney Zak, demanding copies of all documents related to the modification application, the complaint drafted by Zak, and a refund of their money. They have received a copy of their file, but Attorney Zak has not refunded any of their money.

The Ortizes filed a complaint about Attorney Zak and his office with the Attorney General's office in November 2010.

## 13.   Saul and Estella Rivera

The Complainants Saul and Estella Rivera (the "Riveras") are Latino, originally from El Salvador, and do not speak or read English well. They own their home at 17 Allen Street in Somerville, where they live with their 3 children. Saul and Estella Rivera paid Respondent David Zak a total of $5,000 for a loan modification.

Saul and Estella Rivera heard about Attorney Zak on radio station 1600 AM. On the radio, Attorney Zak claimed that he could cut his clients' mortgage payments in half.

The Riveras met with Attorney Zak's employee Blanca Heredia in March, 2010. Ms. Heredia told them that Attorney Zak would get them a loan modification, and that Attorney Zak only takes cases that would be successful. She stated that within 2 – 3 months the Riveras would get a FedEx package with a modification offer from their bank. For these services, Saul Rivera paid $2,500 on March 11, 2010, and $2,500 on April 8, 2010, for a total of $5000.

At the time Saul Rivera went to Zak Law Offices, the Riveras were behind on their mortgage payments by only two months. Attorney Zak stated it was good not to make mortgage payments because if payments were made, the bank would not negotiate a modification. Attorney Zak also stated that the Riveras did not have to talk to the bank, and that they should not answer the phone when the bank calls.

At first the Riveras did not answer the phone when the bank called, but after a while, Estella Rivera thought it would be a good idea. Saul answered the phone when the bank called and told them that the Riveras had retained a lawyer, and the bank said that they have not talked to any lawyer about the case.

As far as the Riveras know, during the year Zak represented them, Attorney Zak's only work on the case was to send a letter to HomEq (now known as Ocwen). The Riveras do not know of any HAMP application filed on their behalf by Attorney Zak.

In October, 2010, Saul and Estella Rivera asked for a meeting with Attorney Zak to find out what was happening with the case. They had not heard any news about the case and were concerned because they had not seen any results. The Riveras met with Attorney Zak that month, and Attorney Zak asked them, "where is your foreclosure notice?" Saul Rivera told him that they had not received one yet. Then Attorney Zak said in an aggressive way, "then what are you afraid of? There's no problem. Everyone is in the same situation. You have to wait for the foreclosure letter, then you will have to pay $3,000 to stop the foreclosure." Attorney Zak was not planning on doing any work on the case until the bank started the foreclosure. Saul Rivera began to communicate with the bank even more after that.

Ultimately, Saul and Estella Rivera received a modification with help from another organization.

14.   Lisandro Sermeñio

The Complainant, Lisandro Sermeñio ("Sermeñio"), is a Latino, originally from
El Salvador, and does not read or speak English. Sermeno paid Respondent
David Zak $2500 to modify his home mortage from IndyMac Mortgage
Services, which had a very high interest rate and a monthly payment of $4,800.

Sermeñio heard advertisements for Attorney Zak on the Spanish-language radio
station, 1600 AM. Attorney Zak said he could lower interests rates and
mortgage payments by half.

Sermeñio went to Attorney Zak's office in Revere in early September 2009, and
met with an employee of Attorney Zak, Evelyn Aguirre. Ms. Aguirre stated
Attorney Zak would lower the interest rate on Sermeñio's mortgage to 4 percent.
Ms. Aguirre said the fee for this was $5,000, and that $2,500 was due
immediately and the second half was due after Attorney Zak obtained the
modification. The contract that Ms. Aguirre had Sermeñio sign was in English
and no translation was provided. Sermeñio gave Attorney Zak a check
for $2,500 on September 10, 2009, so that they could start the process. Ms.
Aguirre promised Sermeñio that Attorney Zak would start the work on my case.

Sermeñio never met with or talked to Attorney Zak, although he asked to speak
with Attorney Zak. Sermeñio only communicated with Evelyn Aguirre, and
other employees named Lydia and Janeidy Cardosa. When Sermeñio called
Attorney Zak's office, he was referred to someone who told him to pay more
money.

Unbeknownst to Sermeñio, the bank had approved him for a trial HAMP
modification on September 8, 2009, as a result of an application he submitted
on his own, prior to his relationship with Attorney Zak. He did not find this out
until after he went the Attorney Zak's office and paid. Lisandro Sermeñio made
the first payment on the trial modification on September 23, 2009. In March,
2010 the bank offered him a permanent modification.

Sermeñio decided not to pay Attorney Zak the second half of his fee because he
did not do any work on the case.

In March, 2011, Sermeñio called the bank and asked if Attorney Zak had ever
communicated with them on his behalf. The bank had no record of an
authorization or any communications with Attorney Zak.

15. Carlos Solano and Magda Sanchez

The Complainants Carlos Solano ("Solano") and Magda Sanchez
("Sanchez")are Latino, originally from Colombia, and they speak Spanish.
They used to own their home at 132 Waldemar Avenue, East Boston. They

paid Respondent David Zak $5,000 for a loan modification which they did not receive. Instead, they lost their home to a short sale.

Solano and Sanchez made an appointment with Zak's offices after hearing a radio advertisement on a Spanish-language radio station, 1600 AM. They met at the offices of Loan Modification Group of Massachusetts in Revere with agent Jhonny Palacios on May 19, 2010. At this meeting, Mr. Palacios explained the process of applying for a modification and gathered some information. Mr. Palacios told Solano and Sanchez that they qualified for a HAMP loan modification and that it was 100 percent guaranteed that they would get a modification and not lose their home. Mr. Palacios also told them that Attorney Zak would have a team of lawyers and accountants working on their case. Mr. Palacios said that the bank would have to make a modification because Zak is an attorney.

Mr. Palacios showed Solano and Sanchez on the computer what the payments would be under the modification. That day, Solano and Sanchez wrote a check to Zak's office for $2,500, half of the demanded fee.

Two days after the May 19 meeting, someone from Attorney Zak's office contacted Solano and asked him to sign a disclosure form titled Non-Guarantee of Loan Modification Result. This form states, among other things, that no employee of Attorney Zak or LMGM ever guaranteed that Zak's office would obtain a modification, and that Solano and Sanchez acknowledged there was no guaranteed result. The date on the disclosure form was May 19. Solano asked about the date on the form and the contradiction between its terms and Mr. Palacios' statement that there was a 100 percent guaranteed loan modification. Mr. Palacios told Solano not to worry, that it was just a paper, and that it was still 100 percent guaranteed. During continued questioning, Mr. Palacios kept saying, "don't worry, don't worry; it's just a paper."

After that Solano and Sanchez would check-in with Attorney Zak's office every two weeks, and the office stated everything was proceeding normally, and not to worry.

Solano and Sanchez made out another check for $2,500 on June 18, 2010, paying a total of $5,000 to Attorney Zak's office. Someone from Attorney Zak's office told Solano and Sanchez to inform them if the bank or its lawyers sent any information.

In July 2010, Solano and Sanchez received a phone call from Bank of America. The bank stated it had not received any HAMP application, and they were trying to discourage a HAMP application. While it was still possible to submit a HAMP application, the bank intimated that such an application might be futile: The owner of the loan would be the one to decide on the HAMP application-

not the bank. The bank stated only two options remained: sell the house, or do a short-sale.

Solano and Sanchez contacted Attorney Zak's office and told them what the bank said.

Someone from Attorney Zak's office instructed Solano and Sanchez not to pay any attention to what the bank said, that everything was okay, that Attorney Zak was the one in charge of the process and not to be afraid.

In the summer of 2010, Solano and Sanchez started to receive letters from Harmon Law Offices on behalf of the bank. Solano and Sanchez then received a foreclosure notice, with a foreclosure sale set for September. Solano and Sanchez made an appointment to meet with Attorney Zak.

In August, 2010, Carlos Solano and Magda Sanchez met with Attorney Zak for the first time. Attorney Zak requested $3,000 more so that another lawyer from Everett would go to court to stop the foreclosure. Solano asked Attorney Zak, "What's the possibility that I pay you the money and the bank forecloses anyway?" Attorney Zak stated in that case Solano and Magda Sanchez would benefit anyway, because they would get to live in the house for three more months, without having to pay the mortgage or rent, and so they would recoup the money. When Solano and Sanchez refused to pay, Attorney Zak told them that as a consequence, they would lose their house.

Shortly thereafter, Solano and Sanchez went to a real estate agent, who helped arrange a short sale and obtained a postponement of the foreclosure sale from the bank. Two days after obtaining the postponement, Attorney Zak's secretary called and claimed that Attorney Zak was the one who stopped the foreclosure. She said that Attorney Zak was charging $3,000 for work he claims to have done in stopping the foreclosure. Solano and Sanchez ignored the repeated calls from Zak's office demanding the payment, and continued to work on doing a short-sale.

In November of 2010, Carlos Solano called Attorney Zak's office to request an invoice or work statement from Attorney Zak. As of yet, Carlos Solano and Magda Sanchez have not received an invoice or work statement.

### 16. Jose Vasquez

The Complainant, Jose Vasquez ("Vasquez"), is a Latino, originally from El Salvador, and speaks and reads English and Spanish. Vasquez owned his home at 28 Walden Street in Lynn, where he lived with his girlfriend and their 2 sons, who are 7 months and 9 years old. Jose Vasquez paid Respondent David Zak a total of $8,100 for a loan modification which he did not receive.

In early 2009, Jose Vasquez went to a bankruptcy attorney to explore that option. He was completely ready to declare bankruptcy, and paid this lawyer $1,200. But then Vasquez heard about Attorney Zak and decided to find out if he could provide a modification.

Vasquez heard Attorney Zak on 1600 AM Radio, a Spanish-language radio program.

In the advertisements Jose Vasquez heard, Attorney Zak promised that he was the only attorney that knew how to obtain modifications in Massachusetts. He said that his work was guaranteed. He listed the names of his clients and the modifications that he had obtained for them. All of the clients had Latino-sounding names.

Vasquez went to the office on April 7, 2009 and met with Ms. Evelyn Aguirre in the Revere Office. He paid $100 for that appointment. Ms. Aguirre told Vasquez that she would review his documents to see if he qualified for a HAMP modification. Ms. Aguirre said that the cost of hiring Attorney Zak was $5,000. Vasquez believed that this would be the entire fee, and he believed that the modification was guaranteed.

Later in April someone who worked for Attorney Zak called Vasquez and told him that he qualified for a modification. The person on the phone scheduled an appointment for Vasquez to meet with Attorney Zak. When Vasquez met with Attorney Zak, he told Jose Vasquez that the loan had many violations and he guaranteed that all was going to be fine. Vasquez told Attorney Zak that he was considering filing for bankruptcy, and Attorney Zak said, "don't do that, you qualify for an Obama modification." Attorney Zak promised that he could get a HAMP modification. At that time, Vasquez wrote a check for $5,000, made out to Loan Modification Group. Attorney Zak never mentioned the necessity for additional payments.

Vasquez was told that from then on the case would be handled by Jhonny Palacios, an employee of Attorney Zak. No one from Attorney Zak's office ever called to give updates on the case. Vasquez called almost every week to find out what was happening with the case and Mr. Palacios, or someone else, would always say that everything was going well. The bank called Vasquez, but he would not answer the bank's calls because employees of Attorney Zak had instructed him not to talk to the bank. Whenever Jose Vasquez received phone calls from the bank, he would call Attorney Zak's office to notify them.

On September 26, 2009, Attorney Zak called Vasquez and told him that no one was working on the case, and asked what was going on. Jose Vasquez was very surprised and upset to hear that no one was working on the case for the last five months.

In March, 2010, Vasquez got a letter from the bank's attorneys notifying him of foreclosure. Vasquez immediately called Attorney Zak's office and told them.

Around this time Vasquez was told that the case was also being handled by Mr. Chandi Gracia and Mr. Diego Garcia. Whenever Vasquez called they would ask him to bring in more paperwork.

In April, Vasquez received a notification from the Massachusetts Land Court. Vasquez called Attorney Zak's office and they told him not to worry, they would take care of it. In May, Vasquez received another letter from the bank's attorney announcing an auction date of May 17, 2010. Vasquez called Attorney Zak's office and they said they would see what happens.

On May 13, 2010, someone from Attorney Zak's office called Vasquez for what he called an "emergency meeting." Vasquez met with Attorney Zak, and Attorney Zak stated that Vasquez needed to pay an additional $3,000 to stop the foreclosure. Attorney Zak told him that the payment was necessary that day, and without payment, he would not help. Vasquez felt there was no choice, so he borrowed $3,000 from his brother-in-law to pay Attorney Zak. Attorney Zak postponed the foreclosure.

In July 2010, Jose Vasquez still had not received a modification. Nonetheless, he received a letter, dated July 7, 2010, from Zak Law Offices PC. The letter stated that they had "pre-qualified [him] for a loan modification .. performed forensic analysis of [his] mortgage documents, submitted a Demand Letter ..., and submitted a HAMP bank package to [his] mortgage company." The letter also stated that "this law firm's engagement in connection with the negotiation of your loan modification with the loss mitigation department of your mortgage servicer has formally concluded."

On July 15, 2010 Vasquez received another foreclosure letter from the bank's attorney, with an auction date of July 29. When he called Attorney Zak's office, an employee told him not to worry, they would get a court to stop it. The foreclosure was postponed until August 11.

On July 23, Zak's office called Vasquez for another "emergency meeting." When Jose Vasquez met with Attorney Zak, Zak requested another $1,000, so that Attorney Matthew Forbes, who worked with Attorney Zak, would represent Jose Vasquez in court. Jose Vasquez became upset, and told Attorney Zak he had paid already paid $8000 for nothing, and refused further payment.

That week employees of Attorney Zak called over and over, demanding payment.

30

Vasquez felt harassed. He had to tell the office again and again that he was not going to pay. Attorney Zak's employees also said if this did not work they could help Vasquez file for bankruptcy, if he paid another $4,000. This upset Vasquez because Attorney Zak had advised him not to file for bankruptcy, because he said he could get a modification.

Vasquez found out that the court date to postpone the foreclosure was August 5, so he went to court on that day. Neither of the attorneys showed up. The court clerk approached Vasquez and asked what case he was there for. She looked up the case and said that Attorney Matthew Forbes of Zak Law Offices was representing him. The clerk called Attorney Forbes and put Jose Vasquez on the phone. Attorney Forbes said that they had been trying to contact Jose Vasquez to bring in more paperwork. Vasquez said that employees of Attorney Zak only called to ask for money. Attorney Forbes stated they were taking the bank to court because they denied the modification application. No one had previously informed Vasquez he had been denied for a modification.

The next day Attorney Zak called Vasquez and requested a meeting. They met and Attorney Zak asked Vasquez why he didn't pay the $1,000. Attorney Zak stated said he would still help if Vasquez paid. He told Vasquez that he did not qualify for a modification, and that the options were to short sell the property or declare bankruptcy.

At that point Vasquez asked for his money back because Attorney Zak was not following through on his promises.

On August 21, 2010, Vasquez sent Attorney Zak a letter requesting all of the paperwork pertaining to the modification negotiations for his home at 28 Walden Street. Vasquez asked Attorney Zak to call and included his cell phone number. Vasquez never got a response to this letter and never received his file from Attorney Zak.

In the fall of 2010, Vasquez started working with a real estate broker who helped stop the foreclosure. The real estate broker told Attorney Zak's office to stop working, told the lender not to talk to Attorney Zak, and asked Attorney Zak to refund all payments.

17. Jose Ventura and Elsa Rodriguez

The Complainants Jose Ventura ("Ventura") and Elsa Rodriguez ("Rodriguez"), are originally from the Dominican Republic, and their children were born in the United States.

Ventura owns two properties in common with his son, Joseph Ventura, both in the city of Lynn: Ventura's home at 46 Wyman Street where he lives with his wife; and a rental property at 21 Alice Avenue, where Joseph lived. They have

mortgages on both the properties: two mortgages on the Wyman Street home, with Litton / Fremont, and one mortgage on the Alice Avenue property with Chase. All of the loans are in both Jose and Joseph Ventura's names. Ventura paid Respondent David Zak a total of $11,600 for modifications of the mortgages. Ventura and Rodriguez got a modification on their Wyman Street home with Attorney Zak. After they stopped working with Attorney Zak, they negotiated with Chase to obtain an in-house modification for the Alice Avenue property on their own.

In February 2009, Ventura went to Attorney Zak's office for help after hearing about him from his friend Elisa Morales, who works for Attorney Zak. Ms. Morales promised that Attorney Zak could provide modifications, resulting in a lower monthly payments. At first there was some question about whether the Alice Avenue property qualified for a modification. Attorney Zak consulted with someone and then Ventura and Rodriguez were told that he could get a modification for that property as well. Ms. Morales said the cost was $5,500 for the home at Wyman Street and $6,500 for the Alice Avenue rental property. At that meeting, Ventura wrote a check for $2,800 to Loan Modification Group. Ventura and Rodriguez paid additional amounts by check: $2,800 on March 16; $3,000 on April 3; and $3,000 on May 7, 2009, for a total of $8800.

Attorney Friedmann sent letters to the home lenders in March, April, and May 2009. Ventura and Rodriguez never met Attorney Friedmann or talked to him, and in fact Attorney Zak told Rodriguez not to talk to Attorney Friedmann.

Attorney Zak's employees did not seem to know who Attorney Friedmann was. Attorney Zak also told Rodriguez not to talk to the banks, so Ventura and Rodriguez ignored all phone calls from the banks.

For the Wyman Street home, Attorney Zak sent documents to the lender, and Ventura and Rodriguez received a HAMP modification of the mortgage.

In early August, 2010, Ventura and Rodriguez received notice that Chase had started the foreclosure process on the Alice Avenue property. Ventura went in to Attorney Zak's office. Attorney Zak stated that the Alice Avenue property did not qualify for a HAMP modification, and that the only option was to declare bankruptcy. Attorney Zak requested a $3,000 fee to hire another lawyer to help with the bankruptcy. Ventura stated did not want to pay Attorney Zak more money, and he did not want to declare bankruptcy. Attorney Zak replied, "I'm the lawyer, not you."

After that meeting, Ventura and Rodriguez stopped working with Attorney Zak. Ventura, began to communicate with the lender, and was able to negotiate a modification. In or around January 2011, Ventura and Rodriguez obtained an in-house modification which lowered payments by $200 a month.

III. RESPONDENTS' DEFENSES

Respondents deny discriminating against the Complainant as charged.

Respondents state that at all times, Respondents sought to assist Complainants to seek settlement of lawfully asserted claims, which might include a lawfully negotiated modification of Complainants' mortgage loan(s). Respondents state that the modification efforts to obtain beneficial financial modifications in the mortgage/lending for Complainants, did not involve Respondent Loan Modification Group, Inc., which only reviewed and analyzed documents and prepared analytical reports.

Respondents state that many hours were spent in an effort pursuing legitimate objectives and claims on the Complainants' behalf. In most instances, the Respondents' efforts resulted in the homeowner obtaining a loan modification. In an effort to provide better service to the clients, including Complainant, Respondents prepared documents in the Spanish language and hired employees (including Attorney Zak) able to converse in Spanish (as well as languages other than English). These efforts were always intended to improve Complainants' understanding of their legal rights and the legal process, not to mislead.

Respondents' marketing efforts disseminated accurate information to members of the public.

Respondents filed a Motion to Dismiss the Complainant's charge as seeks relief pursuant to M.G.L. c. 151B, §4(3B). Complainants filed their Opposition to Motion to Dismiss on September 9. Respondents Motion to Dismiss was denied on October 4, 2011. Following the parties' initial motion practice, MCAD issued a Pre-Determination Discovery Order ("Discovery Order") on November 1, 2011. Pursuant to such Order Complainant issued requests for Interrogatories and Production of Documents on January 13, 2012. On January 24, 2012, Respondents requested that the discovery period be extended and MCAD granted an extension of the Discovery period until March 1, 2012. Respondents have failed to respond to Complainants' discovery requests. They failed to contact either Complainants' counsel or the MCAD to request additional time to respond. In addition, they made no effort to engage in any discovery since the Commission's Discovery Order of November 1, 2011.

IV. FINDINGS AND CONCLUSIONS

Different Terms and Conditions

Complainants have established a prima facie case for discriminatory terms and conditions in housing based on national origin.

33

(a) Complainants are members of a protected class by virtue of the fact that they are Latino; (b) Respondents' business engages in residential real-estate related transactions; (c) Complainants were specifically targeted for Respondents' services because of their national origin; (d) Complainants suffered adverse and discriminatory treatment in regard to the terms and conditions of Respondents' services, giving rise to an inference of discrimination.

Respondents are engaged in residential real estate-related transactions. Under M.G.L. c.151B §4(3B), *"Such transactions shall include but not be limited* to: (1) the making or purchasing of loans *or the provision of other financial assistance for* purchasing, construction, improving, repairing, or *maintaining a dwelling .. .."*(Emphasis added.) Respondents engaged in the provision of other financial assistance for the purpose of maintaining a dwelling, as defined in M.G.L. c. 151B §4(3B), namely the provision of mortgage modification services.

Complainants have alleged that Respondents have discriminated against them in the provision of loan modification services and in the terms and conditions of such services based on their Latino national origin, in violation of M.G.L. c. 151B §4(3B). Respondents have produced no evidence that they have not discriminated against Complainants as described above.

A review of allegations for each of the seventeen (17) Complainants listed above, indicates that Respondents' acts, policies, and practices: may have made and continue to make housing unavailable on the basis of national origin; may have provided and continue to provide different terms, conditions, and privileges in the provision of financial services relating to housing on the basis of national origin.

Discriminatory Statements and Advertisements

Complainants have established a prima facie case for discriminatory statements and advertisements in housing based on national origin in violation of M.G.L. c. 151B, § 4(7B).

Complainants have alleged that Respondents made, printed or published, or caused to be made, printed or published, notices, statements or advertisements, that indicate a preference, limitation or discrimination based on national origin, in violation of M.G.L. c. 151B. §4(7B). Complainants have alleged that Respondent Zak made discriminatory statements to Complainants, including telling Complainant Josue Garcia, "You Hispanics are ignorant" and that Respondent Zak treated Complainants in a hostile and demeaning manner because of their

34

national origin.  Respondents have produced no evidence that they
have not discriminated against Complainants as described above.

## Discrimination In a Place of Public Accommodation

Complainants have established a prima facie case for discriminatory
advertisement in a place of public accommodation on the basis of national
origin in violation of G.L. c. 272 §92A.

(a) Complainants are members of a protected class by virtue of the fact that
they are Latino; (b) Respondents operate a law office, which is a place of
public accommodation, in that it is open to and solicits or accepts the
patronage of the general public; (c) Respondents aired television and
radio advertisements and caused to be printed advertisements only in
Spanish language media, which were intended to target Latino borrowers
and

(b) discriminate against Complainants' full enjoyment of the privileges
offered to the general public by Respondents on the basis of their national
origin.

Complainants have also alleged that Respondents engaged in discriminatory
treatment of them based on their national origin in violation of M.G.L. c. 272
§92A.  Respondents have produced no evidence that they have not
discriminated against Complainants as described above.

## Interference with Complainants' Fair Housing Rights

Complainants have alleged that Respondents coerced, intimidated, threatened
or interfered with Complaints fair housing rights as protected by M.G.L. c.
151B, in violation of M.G.L. c. 151B § 4(4A).  Respondents have
produced no evidence that they have not discriminated against
Complainants as described above.

## CONCLUSION

Because Complainants have met their initial burden of establishing a prima
facie case for discrimination in the extension of real-estate transaction services
and advertising on the basis national origin, under both M.G.L. c. 151B,
§§ 4(3B), (7B) and (4A) and M.G.L. c. 272, §§ 92A and 98, and
Respondents have not presented any evidence that they have not
discriminated, and because genuine issues of material facts exist

as to whether Respondents discriminated against Complainants because of their national origin, a Probable Cause finding is recommended in this case, and the case should be certified for Public Hearing.

Victor M. Posada
Investigator

**Disposition**

Pursuant to section 5 of M.G.L. c. 151B of the Massachusetts General Laws, and in conformity with the foregoing findings, I have this day determined that **Probable Cause** exists for crediting the allegations of the complaint against Respondents. Pursuant to Section 5 of M.G.L. c. 151B, the parties will be afforded an opportunity to participate in a conciliation at the Commission.

Sunila Thomas-George
Investigating Commissioner

36